IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEBRA DYE BROCK,

    **Plaintiff,**

    v.

HONDA OF AMERICA MFG., INC.,

    **Defendant.**

Case No. 2:06-cv-257
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Norah McCann King

## OPINION AND ORDER

This case arises under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, ("FMLA") in which Plaintiff, Debra Dye Brock, alleges that her former employer, Honda of America Manufacturing, Inc., interfered with and restrained her rights under the FMLA by unlawfully terminating her employment. This matter is now before the Court for consideration of the parties' Cross-Motions for Summary Judgment. For the reasons that follow, Defendant's Motion for Summary Judgment is granted; Plaintiff's motion for summary judgment is denied.

### I. FACTUAL BACKGROUND

In October of 1987, Plaintiff Debra Dye Brock ("Plaintiff" or "Brock") was hired as a Production Associate by Defendant Honda of America Manufacturing, Inc. ("Defendant" or "Honda") (Pl. Depo. at 128). After being hired, Plaintiff received a copy of Honda's Associate Handbook and periodically received updated versions. (Pl. Depo. at 131). The Handbook states

that it is a violation of Honda's Associate Standards of Conduct to "[m]isrepresent facts or falsify records or reports, such as personnel records, medical records, leave of absence documentation, etc." (Harper Aff. ¶ 2 & Aff. Ex. A). This encompasses both misrepresentations or falsifications made on documents and those made during the course of an investigation. (Harper Aff. ¶ 2). The Handbook also states that violations of the Standards of Conduct "will result in corrective action up to and including separation from employment." (*Id.* & Aff. Ex. A).

On September 20, 2005, Plaintiff began a leave of absence following the removal of her gallbladder. (Pl. Aff. ¶ 2). In accordance with this leave, Plaintiff faxed to Defendant a Certification of Health Care Provider form ("Certification"), which asserted that Plaintiff required a leave of absence due to her gallbladder surgery, and that the Plaintiff was incapacitated from September 20, 2005 until she was "released by [her] surgeon." (Pl. Depo. Vol. II at 50-51 & Depo. Ex. 10). Consistent with the FMLA, the Leave of Absence Application defined incapacity as "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." (Harper Aff. ¶ 3 & Aff. Ex. B). Honda later approved Plaintiff's leave request. (Harper Aff. ¶ 5).

On October 20, 2005, Plaintiff visited Dr. Pomerants for a follow-up examination, at which point Dr. Pomerants certified that Plaintiff could return to work on October 31, 2005, without restrictions. (Pl. Depo.Vol. II at 57 & Depo. Ex. 11). Four days later Plaintiff visited her primary care physician, Dr. Robinette Huston, who also confirmed that Plaintiff would be able to return to work without restrictions on October 31, 2005. (*Id.*). Plaintiff's leave taken between September 20, 2005 and October 31, 2005 was designated by Defendant as FMLA leave. (Pl. Aff. ¶ 4).

2

On October 26, 2005, an associate in Defendant's Administration Department received an anonymous phone call regarding Plaintiff. (Harper Depo. at 31). The caller stated that two days earlier she had seen Plaintiff, whom the caller reported was "off work" at the time, working at Shaggy Dogs, a dog grooming business located in Galloway, Ohio. (Harper Depo. at 31 & Depo. Ex. 2). The anonymous caller reported that Plaintiff had said "[d]on't tell anyone I am working here." (*Id.*).

In response to this anonymous call, Carleen Harper, a coordinator in Defendant's Administration Department, started an investigation into Plaintiff's conduct. (Harper Depo. at 7, 35). After talking to her manager about the call, Ms. Harper reviewed Defendant's records and determined that Plaintiff was, in fact, off work. (*Id.* at 35-36). The day following the call, October 27, 2005, Defendant sent an investigator, Brad Randall, to Shaggy Dogs to see if Plaintiff was there and if so, to observe her activities. (*Id.* at 43-44).

According to Plaintiff, Mr. Randall took an approximately twenty minute long videotape, in which Plaintiff appeared for approximately five minutes. (Doc. #19 at 4). Mr. Randall's Investigation Report recounted his visit to Shaggy Dogs as follows:

> Upon arrival at the Shaggy Dog[s], I identified [Plaintiff] right away, she was the first person that spoke to me. I filmed her working in front of the desk and behind the desk. She was busy answering the phone and sorting grooming equipment. I pleaded my case to get my dog washed right away. The woman said her name was Deb and she would wash my dog and it would take about 45 minutes. I filmed her taking my dog into another room to wash her. I came back 20 minutes later and she advised me to clean out my dog carrier, at that point she took it upon herself to get on her hands and knees to clean it.
>
> I came back and filmed Deb brushing my dog out after she was done drying. I mentioned what a profitable job this must be, then she stated that she works at Honda and she is just working there part time. At that point, I received my dog and left the shop.

3

(Randall Aff. ¶ 3 & Aff. Ex. A). Randall gave Harper a copy of the video. (Harper Depo. at 46). No employee of Defendant ever mentioned this videotape to Plaintiff in the course of the investigation. (Pl. Aff. ¶ 10).

On October 31, 2005, the day that Plaintiff was released by her surgeon to return to work, she called Defendant and used a call-in vacation day. (Harper Aff. ¶ 7). Plaintiff then requested that Honda extend her FMLA leave from October 31 through November 7, 2005. (Pl. Depo. Vol. II at 64 & Depo. Ex. 12). Plaintiff then took call-in vacation or vacation from November 7, 2005 through November 11, 2005. (Harper Aff. ¶ 7; Pl. Depo. Vol. II at 71). Plaintiff was also absent from work November 11 through November 17, 2005, for recovery-related insomnia. (Pl. Depo. Vol. II at 71-72 & Depo. Ex. 13). Plaintiff supported her request for leave on November 11 through November 16, 2005 with an additional Certification.[1] On November 17, 2005, Plaintiff took a call-in vacation day, which was approved under Honda's policies. (Pl. Aff. ¶ 8).

Plaintiff returned to work at Defendant's plant on November 18, 2005. (Pl. Depo. Vol. II at 73; Harper Depo. at 57). Upon her return, Ms. Harper met with Plaintiff to interview her about her activities while on leave. (Pl. Depo. Vol. II at 5; Harper Aff. ¶ 5). Plaintiff testified that Ms. Harper stated to her in the meeting that Defendant had "sufficient evidence that you were working while on leave . . . . We [Defendant] have sufficient evidence that you were working in a place called Shaggy Dogs." (Pl. Depo. Vol. II at 7-8).

During the interview with Ms. Harper, Plaintiff stated that she visited Shaggy Dogs repeatedly during her leave from Defendant, but she denied having been employed there. (Pl.

---

[1] It is unclear whether Defendant eventually granted FMLA-approval for Plaintiff's absence from October 31 through November 7 and from November 11 through November 16. However, whether or not these subsequent leaves of absence were FMLA-approved is irrelevant for the claims on summary judgment.

4

Depo. Vol. II at 8-10). Plaintiff stated she had become friends with the owner of Shaggy Dogs, Sharon Farrell-Keckley. (Pl. Aff. ¶ 9). Farrell-Keckley had loaned Plaintiff some money, but Plaintiff paid all of the money back and insisted that this was not compensation. (Pl. Aff. ¶ 9; Farrell-Keckley Depo. at 55-56). In addition, neither Farrell-Keckley nor Plaintiff ever considered Plaintiff to be an employee of Shaggy Dogs. (Farrell-Keckley Depo. at 49-52, 61-62, 65-66; Pl. Aff. ¶ 9).

When Ms. Harper asked Plaintiff about her activities at Shaggy Dogs while she was on leave from Defendant, Plaintiff told Ms. Harper that she "[d]id not help out [her] friend at Shaggy Dog[s] while on leave. [She] chit chat[ed] but [was] not doing any type of work." (Harper Aff. ¶ 9 & Aff. Ex. C). Plaintiff also said she "maybe answered [the] phone . . . but did not do any grooming or filing – no work at all." (Harper Aff. ¶ 9 & Aff. Ex. C). On deposition, Plaintiff did not disclose any other activities she performed at Shaggy Dogs, other than often walking her own dogs down to Shaggy Dogs and giving one or more of them a bath. (Pl. Depo. Vol. II at 8-10). At the end of this meeting, Defendant told Plaintiff that she was suspended pending further investigation. (Pl. Aff. ¶ 8).

One week later, Plaintiff telephoned Ms. Harper to check on the status of the investigation. (Pl. Depo. Vol. II at 19-20). Plaintiff then asked Ms. Harper what she meant by "working" at Shaggy Dogs. (*Id.* at 20). Ms. Harper responded "filing, answering the phone, interacting with dogs," and again, Plaintiff denied working there. (*Id.*). However, during this conversation, Plaintiff did admit to interacting with dogs. (*Id.*).

On November 28, 2005, Ms. Harper informed Plaintiff that Defendant had decided to separate her from her employment for misrepresenting or falsifying records and lying during the

5

investigation in violation of Defendant's Associate Standards of Conduct. (Pl. Depo. Vol. II at 27; Harper Aff. ¶ 10; Harper Depo. at 28-29 & Depo. Ex. 1). After her discharge, Plaintiff attempted to avail herself to the Review Panel procedure, an internal appeal procedure available to all employees discharged from Defendant. (Pl. Aff. ¶ 11).

On December 6, 2005, Plaintiff was informed that her Review Panel was scheduled for the next day at 8:30 a.m. (Pl. Depo. Vol. II at 30; Harper Aff. ¶ 13). She was also told that she would have to be on time to her Review Panel or forfeit her right to one. (Harper Aff. ¶ 13). Defendant's Associate Handbook also sets forth this requirement: "If you fail to appear on time for either the Review Panel Selection or Review Panel, you will forfeit your rights to a Review Panel." (*Id.* at ¶ 12 & Aff. Ex. D). Defendant contends that Plaintiff was tardy for her Review Panel.[2] (Cox Aff. ¶ 6). Because Plaintiff was late, the Review Panel did not go forward, and that day Defendant informed Brock that they were upholding her separation. (Pl. Depo. Vol. II at 33-34, 38).

Defendant did not show Plaintiff the videotape of her activities at Shaggy Dogs; the first time Plaintiff viewed the videotape was in preparation for her deposition for this lawsuit. (Harper Depo. at 68). As discussed above, when Plaintiff was interviewed by Ms. Harper on November 18, 2005, Plaintiff stated that her activities were limited to visiting with friends and occasionally answering the phone. (*Id.* at 65; Pl. Depo. Vol. II at 8-10). However, at her

---

[2] On the day of Plaintiff's Review Panel, Gary Cox, the moderator for the Review Panel, was at Defendant's Marysville Auto Plant waiting for the Review Panel to begin. (Cox Aff. ¶ 3). It is his practice to sign in at the security desk as soon as the factory bell rings so that it is clear whether the separated employee arrived on time to their appointment. (*Id.* at ¶ 4). On the day of her Review Panel, Plaintiff signed in after Mr. Cox, and was therefore tardy to her Review Panel. (*Id.* at ¶¶ 5, 6).

6

deposition on February 15, 2007, for the first time, Plaintiff described additional activities she took part in while at Shaggy Dogs. (*See* Pl. Depo. at 123, 166, 190-91, 193-94, 195, 197-99).

At her deposition, Plaintiff stated that during her leave from Defendant in October of 2005, she often walked two or three times per week, ten blocks roundtrip, to Shaggy Dogs. (*Id.* at 123, 166). Plaintiff brought her own smock with her, would put it on when she arrived at Shaggy Dogs, and would wear it while she was there. (*Id.* at 198-99). In the videotape Plaintiff is shown wearing a smock, similar to those worn by other employees. (Harper Aff. ¶ 6). Plaintiff also stated in her deposition that she had cleaned up dog urine from the floor. (Pl. Depo. at 190).

After watching the videotape, Plaintiff testified in her deposition that she took the investigator's dog to a back room and put it in a holding cage. (*Id.* at 197). Plaintiff also stated in her deposition that she had cleaned out a dog carrier, just as the investigator had noted in his report that Plaintiff got down on her hands and knees to clean out his dog carrier. (*Id.* at 195). Plaintiff further testified that she did this because she did not want the dog to lie in a dirty carrier. (*Id.*). The videotape also showed Plaintiff brushing out the investigator's dog; in her deposition, Plaintiff explained that she was not brushing the dog but was examining its skin. (*Id.* at 195, 197). Defendant claims Plaintiff's initial denial of these acts caused Defendant to believe that Plaintiff had misrepresented facts to Defendant in the course of its investigation. On the other hand, Plaintiff contends that she was not working at Shaggy Dogs as Defendant suggests.

## II. SUMMARY JUDGMENT STANDARD

The procedure for considering whether summary judgment is appropriate is found in Fed. R. Civ. P. 56(c); this section provides:

7

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 866 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.*

8

It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

### III. ANALYSIS

The purpose of the FMLA is to balance the demands of the workplace with the needs of employees to take leave from work because of medical conditions or compelling family needs. *See* 29 U.S.C. § 2601(b). The FMLA "entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)). A "serious health condition," is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

There are two distinct theories for recovery under the FMLA: (1) the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2). In her Complaint, Plaintiff alleges facts in support of relief under both theories. On the undisputed facts of this case, however, Plaintiff fails on both the interference and retaliation FMLA theories and Defendant is entitled to summary judgment on both claims.

9

**1. Interference Theory**

29 U.S.C. § 2615(a) provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." In order to prevail on a claim for violation of this provision, the plaintiff must show that he or she was denied an entitlement under the FMLA. *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) (citations omitted). With respect to the particular elements for the claim, the plaintiff must show: (1) he or she is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his or her intention to take leave, 29 U.S.C. § 2611(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled. *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). Furthermore, a defendant employer's subjective intent is not relevant under the interference theory of recovery; the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer. *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

The United States Court of Appeals for the Sixth Circuit has noted, however, that "an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). Moreover, a Plaintiff is "not shielded from disciplinary action for [] dishonesty simply because it concerned an FMLA-qualifying leave." *Kitts v. Gen. Tel. N., Inc.*, No. 2:04-cv-0173, 2005 WL 2277438, at *13-14 (S.D. Ohio Sept. 19, 2005). Similarly, under the FMLA regulations, an

10

employee "has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a).

The parties do not dispute that Plaintiff satisfies the first four elements outlined above. First, Plaintiff is an "eligible employee" as defined in 29 U.S.C. § 2611(2), because she worked over 1250 hours the prior twelve months before commencement of leave on September 20, 2005. Second, Defendant is an "employer" as defined in 29 U.S.C. § 2611(4) because it employed over fifty persons. Third, Plaintiff was entitled to take leave beginning on September 20, 2005 for a "serious health condition." The FMLA leave taken from September 20 through October 31, 2005 was for Plaintiff's gallbladder pre-surgery, surgery, and recovery, which constitutes an impairment that required continuing treatment by a health care provider to satisfy the definition for FMLA leave.[3] Fourth, Plaintiff gave timely notice to Defendant of her need for time off due to her gallbladder surgery.

Nevertheless, based on the evidence presented, there is no genuine issue of material fact to suggest that Defendant denied Plaintiff any FMLA benefits to which she was entitled. Plaintiff requested FMLA leave and Defendants granted that leave, allowing Plaintiff an FMLA-protected leave of absence from September 20, 2005 to October 31, 2005. (Harper Aff. ¶ 5). Plaintiff's Complaint, nonetheless, alleges that Defendant used the taking of FMLA-protected

---

[3] Plaintiff also claims that she had obtained "preexisting approved FMLA intermittent leave for [] insomnia." (Doc. #19 at 3, 16). It is unclear whether she actually obtained such preexisting FMLA approved leave. However, that fact is irrelevant, because even if Plaintiff had obtained the preexisting approved FMLA intermittent leave for insomnia, that leave would have covered absences from November 11 through November 17, 2005, and not the leave from September 20 through October 31, 2005, which is the leave at issue on these motions. (Pl. Depo. Vol. II at 71-72 & Depo. Ex. 13).

11

leave time as a negative factor in discharging Plaintiff, resulting in a violation of Plaintiff's FMLA rights. (Compl. ¶ 22). The undisputed evidence in this case shows that Defendant did not discharge Plaintiff because Plaintiff had used FMLA leave; instead, Plaintiff was terminated for misrepresentation and falsification in violation of Defendant's Associate Standards of Conduct.

According to Honda, Plaintiff made misrepresentations in responding to Ms. Harper's questions concerning her activities while on leave. During the interview with Ms. Harper, Plaintiff contended that she only engaged in chit-chatting and answering the phone at Shaggy Dogs, and otherwise was not working there. (Pl. Depo. Vol. II at 8-10; Harper Depo. at 66 & Depo. Ex. 15; Harper Aff. ¶ 9 & Aff. Ex. C). Furthermore, when given the opportunity to discuss her activities at Shaggy Dogs, Plaintiff failed to disclose several activities that had been captured on undisputed video evidence. (*See* Videotape Ex. to Honda's Motion; Pl. Depo. Vol. II at 8-12). On deposition, Plaintiff stated that when Ms. Harper asked her in the initial interview if she was "working at a place called Shaggy Dogs," Plaintiff answered "[n]o." (Pl. Depo. Vol. II at 8). Plaintiff was then asked if she said anything else about Shaggy Dogs in her interview with Ms. Harper, and Plaintiff testified that:

> "I [Plaintiff] was acquainted with the lady that owns the place, and that she said that if I came down I could eat lunch with them at any time. And I went down often, that I took – you know, I would walk my dogs and I would – if I wanted to give one or more a bath at any time, I did."

(*Id.* at 10).

Additionally, Plaintiff was asked if there was anything else she had said to Ms. Harper about "activities that [Plaintiff] engaged in at Shaggy Dogs." (Pl. Depo. Vol. II at 10). Plaintiff responded "all I remembered saying was '[n]o.'" (*Id.*). Plaintiff further testified that in the

12

earlier interview Ms. Harper had asked, "[a]re you sure you don't want to tell us something?" (*Id.* at 12). Again, Plaintiff denied having any additional activities to disclose. (*Id.* at 12). Thus, when asked on deposition what activities she engaged in while at Shaggy Dogs, Plaintiff only disclosed answering the phone, chit-chatting, eating lunch with the owner, and giving one or more of her own dogs a bath. (*See id.* at 8-12).

These statements, however, are directly refuted by Defendant's undisputed videotape evidence of Plaintiff's activities at Shaggy Dogs. (*See* Videotape Ex. to Honda's Motion; Randall Aff. ¶¶ 3, 4 & Aff. Ex. B). It was only after viewing the videotape, on deposition, that Plaintiff admitted to performing additional activities at Shaggy Dogs while on leave from Honda. In particular, Plaintiff admitted for the first time on deposition to wearing a smock, cleaning up dog urine, brushing a dog, touching and playing with dogs, listening to the owner's advice on grooming while watching the owner groom a dog, putting a dog in a holding cage, examining a dog's skin, getting on her hands and knees to clean out a carrier, and moving supplies from the counter and putting them below the counter. (Pl. Depo. at 195, 197-98). Plaintiff's own recall of her interview with Ms. Harper is in contradiction to what Plaintiff later admitted in deposition after viewing the undisputed video evidence. (Pl. Depo. Vol. II at 8-12; Pl. Depo. at 195, 197-98). The video shows that Plaintiff was performing all of these activities at Shaggy Dogs, yet Plaintiff did not disclose any of these details when asked about her activities.[4]

Defendant's Associate Handbook states that it is a violation of Defendant's Associate Standards of Conduct to "[m]isrepresent facts or falsify records or reports, such as personnel

---

[4] Plaintiff's initial statements to Ms. Harper are also contradicted by the fact that she told Defendant's investigator that she was working part time at Shaggy Dogs, a fact which Plaintiff does not dispute. (Randall Aff. ¶ 3 & Aff. Ex. A).

13

records, medical records, leave of absence documentation, inventory counts, quality control reports, etc." (Harper Aff ¶ 2; Aff. Ex. A). This rule encompasses both misrepresentations or falsifications made on documents and those made during the course of an investigation. (Harper Aff. ¶ 2). The Handbook further provides that violations of the Standards of Conduct "will result in corrective action up to and including separation from employment." (*Id.* & Aff. Ex. A).

Given these undisputed facts, there is no genuine issue of material fact that Plaintiff misrepresented facts about her activities at Shaggy Dogs during Defendant's investigation into her conduct. Defendant had, under its Associate Standards of Conduct, cause to terminate employees for misrepresentations of fact during the course of investigation. (Harper Aff. ¶ 2). Based on undisputed videotape evidence, Defendant discovered that Plaintiff had misrepresented facts about her activities at Shaggy Dogs, and therefore decided to terminate her employment.

Plaintiff also contends that, since Honda has no rule against "moonlighting" for employees who are not on leave, it cannot arbitrarily impose an unwritten rule against "moonlighting" on those on FMLA leave. (Doc. #19 at 18). This would be improper, according to Plaintiff, because it is not treating those on leave the same as if they were not on leave. (*Id.*). This argument is misplaced. It is irrelevant that Defendant had no rule against moonlighting for employees not on leave, because Defendant did not terminate Plaintiff for her alleged "moonlighting." Instead, Plaintiff was terminated as a result of her misrepresentations. As discussed above, the misrepresentations were in violation of Defendant's Associate Standards of Conduct, and this violation—not the act of moonlighting itself—was the reason for Defendant's decision to separate Plaintiff from her employment.

14

Plaintiff further asserts that Defendant's investigation into Plaintiff's activities was not within the legal framework of the FMLA because it "was not designed to determine whether Plaintiff was or was not actually entitled to FMLA protection." (*Id.* at 19). Yet as this Court has stated, "[n]othing in the FMLA prohibits an employer from investigating allegations of dishonesty or from terminating an employee who violates company policies governing dishonesty. The FMLA does not shield an employee from termination simply because the alleged misconduct concerns the use of FMLA leave." *Kitts*, 2005 WL 2277438, at *11 (S.D. Ohio, J. Holschuh). *See also Hoffman v. Professional Med. Team*, 394 F.3d 414 (6th Cir. 2005); *Hoskins v. Pridgeon & Clay, Inc.*, slip op., No. 1:05-CV-816, 2007 WL 1031636, at *10-11 (W.D. Mich. Apr. 3, 2007). Plaintiff was not entitled to special protection from Defendant's company rules merely because she invoked her FMLA rights. The Court therefore concludes that Defendant did not interfere with Plaintiff's rights under the FMLA. As a result of this finding, the Court also finds it unnecessary to resolve the after-acquired evidence issue[5]. (*See* Doc. #19 at

---

[5]In its Motion for Summary Judgment, Defendant asks that if the Court finds Defendant violated Plaintiff's FMLA rights, that Plaintiff's damages be limited under the after-acquired evidence doctrine. (Doc. #15 at 15-16). The after-acquired evidence doctrine states that when an employer learns *after* separating an employee that the employee engaged in some other form of conduct that also would have caused his separation, the employee loses his ability to seek reinstatement and his damages are cut off as of the date the employer learns of the misconduct. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362-63 (1995). Defendant argues that because it discovered an additional misrepresentation after Plaintiff's termination that also would have caused Plaintiff's separation, any damages awarded to Plaintiff should be limited by the after-acquired evidence doctrine. (*See* Doc. #15 at 15-16).

On November 23, 2005, Plaintiff requested additional FMLA leave from November 11 through November 17, 2005, and her accompanying Certification stated that Plaintiff had "office appointments" with Dr. Huston on November 7 and November 14, 2005. (Pl. Depo. Vol. II at 71-72 & Depo. Ex. 13). Dr. Huston, however, testified that Plaintiff did not have office appointments on those dates; in fact Plaintiff did not have *any* appointments with Dr. Huston between October 24 and November 17, 2005. (Huston Depo. at 7, 14, 15-16, 26). Because this was a misrepresentation in violation of Defendant's Associate Standards of Conduct, it also would have caused Plaintiff's separation when Defendant discovered the misconduct. Accordingly, Defendant argues that even if Plaintiff could pursue an FMLA claim, any back pay or other damage award should be limited to the time between her termination on November 28, 2005, and the date of Dr. Huston's deposition on April 24, 2007, when Defendant learned of these misrepresentations. (Doc. #15 at 16).

In response, Plaintiff argues that Dr. Huston, and not Plaintiff, filled out the part of the forms that contained the

15

19; Doc. #20 at 7). Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA interference claim.

## 2. Retaliation Theory

In Plaintiff's Complaint and Plaintiff's Response in Opposition and Cross-Motion for Summary Judgment, Plaintiff alleges a retaliation claim under the FMLA. In *Edgar*, the Sixth Circuit held that while "[t]he employer's intent is not a relevant part" of a FMLA interference claim, it is an "integral part" of the analysis of a retaliation claim. 443 F.3d at 507-08. "What makes the employment decision unlawful under the [retaliation] theory is the motive of the employer—namely, that the action was taken because the employee exercised, or complained about the denial of, FMLA-protected rights." *Id.* at 512. Plaintiff claims that her taking FMLA leave motivated the employer's action to terminate her from her employment. (*See* Compl. ¶ 22).

The retaliation theory utilizes the familiar *McDonnell Douglas* burden-shifting framework. That is, in order to establish a *prima facie* case for retaliation under the FMLA, the plaintiff must show: (1) he or she engaged in an activity protected by the FMLA; (2) the exercise of his or her rights under the FMLA was known to the defendant; (3) the defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). If the plaintiff establishes a *prima facie* case

---

alleged misrepresentation (Doc. #19 at 19). Plaintiff further argues that she trusted Dr. Huston to fill out the forms correctly and did not "fact check" the forms; because she did not intend to deceive Defendant, she should not be barred from recovery. (*Id.*). According to Plaintiff, this creates a genuine issue of material fact. However, the Court finds it irrelevant whether this alleged misrepresentation would have also caused Plaintiff's separation, because Defendant had alternative grounds for lawfully terminating Plaintiff. As discussed above, Defendant did not violate Plaintiff's FMLA rights, and thus the Court need not resolve the after-acquired evidence issue that deals with limiting Plaintiff's damages.

for retaliation, the burden of production of evidence shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, "the plaintiff may attempt to establish that he or she was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citations omitted).

Even if the Court presumes that Plaintiff has established a *prima facie* case of retaliation under the FMLA, Defendant has come forward with a legitimate, nondiscriminatory reason for the adverse employment actions taken. As discussed above, Defendant concluded that Plaintiff misrepresented her activities at Shaggy Dogs while on leave from Honda. This conduct by Plaintiff violated Defendant's Associate Standards of Conduct, and Defendant's rules stated that such a violation could result in the employee's termination. Thus, Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff.

Furthermore, Plaintiff has offered no evidence to indicate that Defendant's proffered reason for terminating Brock is not the true reason for the termination. Plaintiff has not come forward with any evidence to indicate that Defendant deliberately used the misrepresentation to cover another reason for the adverse employment action. Plaintiff must present evidence that

17

Defendant's proffered explanation is unworthy of credence, and she does not present any evidence to this effect[6].

The Court concludes that its decision to terminate Plaintiff was not retaliatory in violation of the FMLA. Accordingly, Honda is entitled to summary judgment to the extent Plaintiff raises an FMLA retaliation claim.

## IV. CONCLUSION

For all of the foregoing reasons, Defendant's Motion for Summary Judgment (**Doc. #15**) is **GRANTED** and Plaintiff's Motion for Summary Judgment (**Doc. #19**) is **DENIED**. The Clerk is **DIRECTED** to enter Judgment in favor of the Defendant and to close this case.

**IT IS SO ORDERED.**

12-14-2007
**DATE**

**EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE**

---

[6]Further, even if Defendant was mistaken as to whether Plaintiff had, in fact, misrepresented facts in the interview, such a mistaken belief does not amount to pretext for FMLA discrimination. *See Campbell v. Washington County Public Library*, slip op., 2007 WL 2050716, at *4 (6th Cir. July 13, 2007) (citing *Chrysler Corp.*, 155 F.3d at 806-808).

18